IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**RONALD L. HUBER, WILLIAM J. AIRGOOD,**
**ANTHONY DEFABBO, JOHN DINIO,**
**ERNEST GISHNOCK, JOHN BIDLENCSIK,**
**HILMA MULLINS and WILLIAM DEEM,**
**individually and on behalf of those similarly**
**situated,**

       **Plaintiffs,**                    **02cv304**

   **v.**

**ROBERT G. TAYLOR, II, ROBERT G.**
**TAYLOR, II, P.C., CLETUS P. ERNSTER,**
**III, GEORGE E. CIRE, JR., TAYLOR &**
**CIRE, TAYLOR & ERNSTER, P.C.,**
**ROBERT A. PRITCHARD, CHRISTOPHER**
**FITZGERALD, LAW OFFICES OF**
**ROBERT A. PRITCHARD, PRITCHARD**
**LAW FIRM, PLLC, JOSEPH B. COX, JR.,**
**JOSEPH B. COX, JR., P.C., COX AND**
**COX, L.L.P., J. ROBERT DAVIS, JR., and**
**TAYLOR, DAVIS & ERNSTER, P.C.,**

       **Defendants.**

## MEMORANDUM OPINION

### I.    INTRODUCTION

     This breach of fiduciary duty case, which has a protracted procedural and factual history,[1]

centers around allegations by plaintiffs, who were asbestos litigants from Pennsylvania, Indiana

and Ohio, who received settlements in class action litigation pending in Mississippi.  All eight

plaintiffs were exposed to asbestos during their work, but none have developed malignant

asbestos-related disease.

---

    [1]To date, there are 344 docket entries and the docket sheet is over 71 pages in length.  The
background of the case has been fully explained in this Court's Memorandum Opinion of
February 7, 2005 (doc. no. 279) and by the United States Court of Appeals for the Third Circuit,
*Huber v. Taylor*, 467 F.3d 67 (3d Cir. 2006), and need not be repeated in its entirety herein.

Plaintiffs signed contingent fee agreements with several non-party local attorneys from their respective home states, who had previously entered into a co-counsel agreements with Robert G. Taylor, II, a Texas attorney, who, in turn, entered into "upstream co-counsel arrangements" with several attorneys, the other defendants, who were lead counsel in asbestos class action litigation primarily pending in Texas and Mississippi (collectively referred to as "Lead Counsel" or simply "defendants"). Plaintiffs currently allege that Lead Counsel breached fiduciary duties owed to them by, among other things, the failure of the non-party local attorneys to adequately disclose certain information surrounding settlement of their asbestos claims. All contact with plaintiffs concerning the litigation and settlements were by the local attorneys and ParaPro, a paralegal business affiliated with Taylor's law firm. Significantly, neither defendant Taylor (lead Texas counsel) nor any of his co-defendants had retainer agreements with plaintiffs; rather, while Lead Counsel litigated the claims and negotiated the settlements with the asbestos companies, Local Counsel maintained the traditional attorney-client relationship with the plaintiffs, with whom they had executed contingent fee agreements.

As the United States Court of Appeals for the Third Circuit elucidated in its October 31, 2006 opinion, "Taylor's fee arrangement," i.e., the arrangement between him and other lead counsel ("Lead Counsel" or simply "defendants") and non-party Local Counsel (or simply "Local Counsel"), "is the key to understanding Plaintiffs' case." *Huber v. Taylor*, 469 F.3d 67, 70 (3d Cir. 2006)). It is against this backdrop that this Court will consider the current pending motions.

II.      **BACKGROUND FACTS**

A.      **Background and Memorandum Opinion of United States Court of Appeals for the Third Circuit**

Plaintiffs, Ronald Huber, William J. Airgood, Anthony Defabbo, John Dinio, and Ernest Gishnock, are former steelworkers from Western Pennsylvania who signed retainer agreements with current non-party Attorney William Mitchell, of Washington, Pennsylvania in 1999.  John Bidlencsik, is a former steelworker from Cleveland, Ohio, who signed a retainer agreement with current non-party Attorney James Tavens, also of Ohio, in 1999.  William Deem and Hilma Mullins are former steelworkers from Indiana who signed retainer agreements with the current non-party law firm of Gikas & Sams, also of Indiana, in 1996 and 1997, respectively.

All eight plaintiffs were exposed to asbestos during their work, but none have developed malignant asbestos-related disease.  All plaintiffs, other than Huber, are or were smokers.  All plaintiffs retained the above mentioned non-party Local Counsel in their home states to prosecute their asbestos claims for a 40% retainer fee.

Rather than reiterate all of the facts from this Court's prior Memorandum Opinion on summary judgment, this Court will quote the following facts (some of which are highlighted for reasons which will be explained later in this opinion), which were aptly summarized by the United States Court of Appeals for the Third Circuit in its recent Opinion:[2]

> Local Counsel had previously entered into co-counsel agreements with Robert G. Taylor II, a Texas attorney involved in Cosey.  Taylor had his own client base in Texas but was looking to expand his asbestos client "inventory."  Taylor contracted with Local Counsel to serve as co-counsel for any future asbestos plaintiffs that Local Counsel would represent in

---

[2]For ease of reading, this Court has omitted the footnotes from the opinion of the Court of Appeals.

exchange for Taylor receiving between 95% and 97.5% of Local Counsel's fees if suit were brought outside of Local Counsel's home state, and a smaller amount if suit were brought in the home state. The agreements between Taylor and Local Counsel provided that, if the asbestos suits were filed in a state other than Local Counsel's home states, Texas law would govern the contingent fee contract.

**Taylor's fee arrangement is key for understanding Plaintiff's case.** First, it meant that employment as Local Counsel could only be profitable as volume, rote work because Local Counsel would keep only one to two percent of any particular case. Since many recoveries were in the range of a few thousand dollars, Local Counsel collected very little from any particular representation. Second, the fee arrangement meant that, all things being equal, co-counsel representations were less profitable to Taylor than representations of direct clients because of the fee-splitting involved. Third, the arrangement meant that the one to two percent local counsel cut, when aggregated among all Local Counsel, as it was from Taylor's perspective, represented a sizeable amount given the hundreds of millions of dollars of recoveries.

Taylor himself had entered into upstream co-counsel agreements with Fitzgerald and Pritchard, who in turn entered into an upstream co-counsel agreement with Joseph B. Cox. Jr. to negotiate settlements, for which Cox would receive four percent of all gross settlements. **Plaintiffs allege that they were never informed of the various co-counsel arrangements.**

Cox negotiated settlements with asbestos defendants W.R. Grace, Owens Corning, Fiberboard, and the Center for Claims Resolutions (CCR), an organization created by 19 asbestos defendants to settle asbestos claims. Under the terms of all the settlements, the payout varied both by level of injury and by the home state of the claimants. In all the settlements negotiated by Cox, Northerners received payouts that were between 2.5 and 18 times lower than those received by plaintiffs from Mississippi and Texas (Southerners). Northerners, who joined in the Mississippi actions nonetheless received a larger settlement than similar asbestos plaintiffs from Pennsylvania, Ohio, and Indiana usually receive in their home state courts. Defendants, in settling these cases for Southerners, did not have to share their fees with Local Counsel, as they had to do with Northerners. Plaintiffs allege that the difference in the settlement payouts to Northerners is attributable to this incentive of Defendants to allocate a greater percentage of aggregate settlements to Southerners in order to minimize Local Counsel's percentages. This marginal percentage difference becomes significant in light of the scale of the settlements. The record contains the

4

approximate or maximum values of eleven of the nineteen settlement agreements negotiated by Defendants.  We calculate these eleven settlement agreements to total some $400 million.  Therefore, on just this portion of the total settlements, Defendants stood to gain up to $10 million (2.5% of $400 million) at the expense of Northerners (and Local Counsel), depending on how the settlements were allocated between Northerners and Southerners.

Defendants reply to this allegations by asserting that the settlements were not aggregate settlements that they then allocated as they saw fit.  Instead, Defendants claims that the plaintiffs in the settled cases were presented with offers that varied for different individuals based on factors such as the type of injury or asbestos exposure, lifestyle habits like smoking, and geographic origin.  Defendants claim that geographic origin is an appropriate factor in determining settlement value because jury verdicts in northern states are traditionally lower than in southern states and because, in southern courts, jury verdicts for Northerners are typically lower than for Southerners in their home state.  For purposes of this appeal, we need not resolve whether these settlements were aggregated, but we note that there is language in some of the settlement agreements that strongly supports the contention that they were aggregate settlements.  Moreover, the very documents Defendants cite in their brief refer to settlements as aggregates.

**After each of the settlement agreements was negotiated, the Northerners received various disclosures.  These disclosures were made by Local Counsel and Parapro Enterprises, Inc., a paralegal service associated with Taylor.**  The Northerners were presented with a release, a check, and a disbursement sheet.  The release was explained orally to Northerners by Parapro paralegals.  The disclosures did not reveal the settlements' material terms or the nature of Defendants' involvement in the cases.  The written disclosures states that further information about the settlements was available on request.  The record does not state whether any of the Plaintiffs sought to avail themselves of this information.  Plaintiffs have introduced evidence that neither the Parapro paralegals nor Local Counsel were themselves aware of the full terms of the settlements or even had access to the complete settlement agreements.

The Plaintiffs brought suit in the Western District of Pennsylvania on behalf of the putative class of Northerners.  **Plaintiffs have not sued their Local Counsel or Parapro.**  Plaintiffs allege several counts, including breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and conspiracy to breach fiduciary duty.  Plaintiffs allege that Defendants owe them a fiduciary duty as their counsel; that Defendants engaged in an undisclosed,

> multiple representation; that Defendants had a conflict of interest regarding their multiple representation because of the fee arrangements that gave Defendants a larger percentage of Southerners' recoveries than of Northerners' and that this created an incentive for Defendants to negotiate settlements that paid more for Southerners' claims than for Northerners'; and that Defendants never gave proper disclosure of this conflict of interest or of the full terms of the settlement offers.

*Huber,* 469 F.3d at 70-72.  (Emphasis added).

### B.   Local Counsel in Pennsylvania, Ohio and Indiana

In 1995, Attorney James Tavens, an Ohio attorney, entered into a co-counsel agreement with Robert G. Taylor, II, P.C., d/b/a Taylor & Cire, P.C.  Also, in or around 1996, Attorneys Linda Sams and Rick Gikas, who practice in Indiana, through their firm, Gikas & Sams, entered into a co-counsel agreement with Robert G. Taylor, II, P.C., d/b/a Taylor & Cire.  (Doc. Nos. 276-277,  Joint Stipulation of Facts at 13).

In or around 1997, Walter Lonce, the newly-elected president of Local 227 of the United Steel Workers of America (USX-Irvin Works) in Western Pennsylvania, sought counsel to represent his union members in asbestos personal injury cases.

Attorney Mitchell provided legal services to Local 227.  Lonce asked Mitchell to locate counsel to represent the union members in asbestos personal injury cases.  In 1998, Mitchell contacted defendant Taylor concerning the possibility of representing steel workers from Western Pennsylvania in asbestos personal injury suits.  Mitchell subsequently entered into a co-counsel agreement with Robert G. Taylor, II, P.C., d/b/a Taylor & Cire.  Defendant Taylor told Mitchell that Pennsylvania offered "very limited" relief for asbestos claimants, and that Taylor would therefore "try to get [the Pennsylvania plaintiffs] involved in the state of Mississippi."  Among Local 227 members are plaintiffs Airgood, DeFabbo, Dinio, Gishnock, and Huber.  *See* Joint Stipulation of

Facts at 13.

Tavens, Sams, and Mitchell were assisted by paralegals from a litigation management firm called Parapro, Inc. ("Parapro").  Parapro was created in Texas in 1995 and entered into a contract with Taylor & Cire, P.C. to provide paralegal services.  *See* Joint Stipulation of Facts at 14.

Beginning in early 1999, members of Local 227 reported to their union hall for chest x-rays and to provide preliminary information concerning their work history and occupational exposure to asbestos.  *Id.*  Those whose x-rays showed asbestos-related injuries, such as asbestosis or asbestos-related pleural disease, were contacted by Attorney Mitchell and/or Parapro.  Those with positive test results completed more detailed questionnaires and underwent pulmonary function medical tests. At the direction of Taylor, Parapro transmitted names of prospective plaintiffs to The Law Offices of Robert A. Pritchard for joinder in pending Mississippi actions, including, but not limited to, *Cosey* and *Rankin*.  *Id.*

### C.   Representations to the Pittsburgh Plaintiffs

Significantly, neither defendant Taylor nor any of his co-defendants had retainer agreements with plaintiffs; rather, while Taylor litigated the claims and negotiated the settlements with the asbestos companies, Local Counsel communicated with and maintained the attorney-client relationship with the plaintiffs.

Paralegals from the ParaPro Litigation Management Firm assisted local counsel in communicating with individual clients. *See* Cummings Tr. at 17; Sams Tr. at 18-23; Colafella Tr. at 42-44.  Local Counsel testified that they oversaw the settlement administration process and paralegal activities, and made themselves available to answer plaintiffs' questions. *See* Taylor 10/8/03 Tr. at 54-55; Sams Tr. at 29, 33, 54-55; Colafella Tr. at 43, 45-47; Tavens Tr. at 44.

The agreements that Taylor negotiated on behalf of plaintiffs were not binding on any claimants; rather, each agreement permitted plaintiffs to choose whether they ultimately wanted to participate. *See* Taylor 10/8/03 Tr. at 34-35; Hughes Tr. at 126-27; Podesta Tr. at 103-04; Tavens Tr. at 161-62; Sams Tr. at 69-70.  Plaintiffs who chose to "opt-out" of a settlement were entitled to pursue their claims individually.  *See* Podesta, Tr. at 105-106; Rooney, Tr, at 86-98; Taylor Tr., 10/8/03 at 34-35.

### III.   PROCEDURAL BACKGROUND

On February 7, 2002, plaintiffs, who are former asbestos litigants from Pennsylvania, Indiana and Ohio,[3] brought a fourteen count complaint against Lead Counsel only, alleging a multitude of tort claims based on claims that defendants engaged in fraud, conversion, deceptive trade practices, civil conspiracy, legal malpractice, aiding and abetting, and otherwise breached their fiduciary duties based on allegedly unauthorized, undisclosed settlement of asbestos personal injury claims in the aggregate and on Lead Counsel's purported misconduct in administering the settlement.

This case was assigned to the Honorable Donald Lee.  After extensive briefing, on the issue of class certification as well as numerous other dispositive and nondispositive motions, on  January 6, 2003, upon Judge Lee's going on inactive status, this case was reassigned to the undersigned.

On February 12, 2003, this Court entered an order denying class certification without prejudice for plaintiffs to re-file said motion after the parties attempted to reach a consensus on the certification issue (doc. no. 94).  The parties were unable to agree on class certification, and after extensive briefing on the issue, on May 3, 2004, this Court entered an order denying class

---

[3]Five of the plaintiffs reside in the Western District of Pennsylvania, two reside in Indiana and one resides in Ohio.

certification on the basis that: (1) individual questions about disclosures, reliance, causation, damages and choice of law predominated over issues common to the class; (2) because of predominance of individual questions, a class action was not the most efficient way to litigate the matter; (3) plaintiffs were not typical of the putative class of Northerners because six of the eight plaintiffs had not qualified for the CCR settlement offer; and, (4) plaintiffs were inadequate class representatives because their interests were no longer aligned with other Northerners because they were no longer represented by defendants in asbestos litigation, unlike other Northerners, such that this fact would create a conflict of interests between them and the putative class (doc. nos. 200-201).

Also, during that time, it is worth noting that plaintiffs filed two amended complaints (doc. nos. 4, 174), and the parties agreed to retain a special master, the Honorable Donald E. Ziegler, former Chief Judge of this Court, who served in this capacity as special master over discovery disputes (see doc. nos. 131, 140, 142, 143, 158, 210).

Then, on November 19, 2004, defendants filed a motion for summary judgment (doc. no. 230) and plaintiffs filed a motion for partial summary judgment (doc. no. 238).  After many rounds of briefing, on February 7, 2005, this Court, by memorandum opinion and order, denied plaintiffs' motion for partial summary judgment, granted defendants' motion for summary judgment, entered judgment in favor of defendants and against plaintiffs, and marked the docket closed (doc. nos. 279-280).

This Court denied plaintiffs' motion for partial summary judgment and granted defendants' motion for summary judgment on the basis that under the laws of Ohio, Indiana or Pennsylvania, plaintiffs had failed to present evidence of actual harm or evidence that defendants non-disclosures were the proximate cause of their harm, both of which were required elements in all of plaintiffs'

claims.  This Court defined the actual harm requirement as a showing of evidence that "'but for' [Lead Counsel's] conduct, [plaintiffs] could or would have received more favorable offers." *Huber,* 469 F.3d at 72.

On March 7, 2005, plaintiffs filed their notice of appeal to the United States Court of Appeals for the Third Circuit (doc. no. 282).  Plaintiffs appealed both the denial of class certification and summary judgment with respect to three claims *only*: (1) breach of fiduciary duty; (2) aiding and abetting a breach of fiduciary duty; and (3) civil conspiracy to breach of fiduciary duty.  Plaintiffs did not appeal the grant of summary judgment with respect to the claims of fraud, conspiracy to defraud and convert, legal malpractice, conversion, and violation of deceptive trade practices laws, and accordingly, the Court will not consider those claims in the context of the current pending motions.

On December 6, 2006, this Court received the mandate from the Court of Appeals for the Third Circuit, vacating this Court's opinion and order on summary judgment and remanding for further proceedings.  *Huber v. Taylor*, 469 F.3d 67 (3d Cir. 2006).

A majority of the panel on appeal found that Texas law was applicable to the instant dispute, despite the fact that the parties did not specifically argue, either before the district court or the Court of Appeals for the Third Circuit, that Texas law should apply.  The application of Texas law is crucial, because unlike the laws of Pennsylvania, Ohio and Indiana, Texas law does not require *actual* injury in order to make a successful claim for breach of fiduciary duty when the remedy sought is disgorgement.  The Court of Appeals agreed with this Court's finding that plaintiffs suffered no actual harm or damages, stating that "if Plaintiffs must show causation and actual injury, they lose . . . ."  *Huber*, 467 F.3d at 73.  However, because it determined Texas law applied to

10

plaintiffs' claims for breach of fiduciary duty, the Court of Appeals then vacated this Court's grant of summary judgment, vacated the denial of class certification, and remanded this case for further consideration in light of applicable Texas law.  (Doc. No. 289-2 at 35).

Following a status conference on December 13, 2006 (doc. no. 299) at which a fifth amended case management order was entered setting forth a detailed briefing schedule (doc. no. 302), the parties have filed numerous motions.  Currently pending before the Court are (1) defendants' motion to dismiss for lack of subject matter jurisdiction (doc. no. 310); (2) defendants' motion to dismiss for failure to join necessary and indispensable parties (doc. no. 311); (3) defendant's (Cox and Cox) motion for summary judgment (doc. no. 312); (4) defendant's (estate of Robert Pritchard and Pritchard Law Firm) motion for summary judgment (doc. no. 320); (5) plaintiffs' motion for class certification (doc. no. 323); and, (6) plaintiffs' motion for leave to file a third amended complaint (doc. no. 325).

## IV.     THE PENDING MOTIONS

### A.     Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to Rule 12(b)(1) (doc. no.  310)

#### i.     Standards.

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the lack of subject matter jurisdiction over a claim.  *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (distinguishing non-jurisdictional issues from jurisdictional issues and holding that only jurisdictional issues should be evaluated under the standard for a Rule 12(b)(1) motion). When a motion to dismiss challenges subject matter jurisdiction, the district court must

distinguish between "12(b)(1) motions that attack the complaint on its face and 12(b)(1) motions that attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *Mortensen v. First Fed. Sav. & Loan Assoc.*, 549 F.2d 884, 891 (3d Cir. 1977) (explaining that 12(b)(6) motions necessitate a ruling on the merits while other motions to dismiss deal with procedural defects, and 12(b)(1) motions in particular address the trial court's power to hear the case).

In ruling on 12(b)(1 ) motions to dismiss that attack the complaint on its face, "the court must consider the allegations of the complaint as true." *Id.* Dismissal for a facial challenge is "proper only when the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous.'" *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1408-09 (3d Cir. 1991) (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)). Where defendants' challenge to subject matter jurisdiction is a factual one, however, the district court will look beyond the pleadings in deciding the 12(b)(1) motion. *See Cestonaro v. United States,* 211 F.3d 749 (3d Cir.2000). When defendants make a colorable Rule 12(b)(1) challenge to subject matter jurisdiction, the plaintiff bears the burden of proving that the relevant jurisdictional requirements are satisfied. See *Development Fin. Corp. v. Alpha Housing & Health Care*, 54 F.3d 156, 158 (3d Cir. 1995).

### ii.   Federal Court Jurisdiction Generally.

The federal courts are courts of limited jurisdiction which is defined strictly by Congress, and so it is a "bedrock principle that federal courts have no jurisdiction without statutory authorization." *Exxon Mobile Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 543, 553 (2005). As the United States Supreme Court recently explained, the "basic statutory grants of federal

court subject matter jurisdiction are contained in 28 U.S.C. §§ 1331 and 1332.  Section 1331

provides for '[f]ederal-question' jurisdiction, § 1332 for '[d]iversity of citizenship' jurisdiction.

A plaintiff properly invokes § 1331 jurisdiction when she pleads a colorable claim 'arising

under' the Constitution or laws of the United States. . . . [and] invokes § 1332 jurisdiction when

she presents a claim between parties of diverse citizenship that exceeds the required

jurisdictional amount, currently $75,000. See § 1332(a)."  *Arbaugh v. Y&H Corp.*, 546 U.S. 500,

126 S.Ct. 1235, 1244 (2006).  Federal courts themselves are under "a continuing obligation to

investigate their jurisdiction over the matters before them."  *Golden ex rel. Golden v. Golden*,

382 F.3d 348, 354 (3d Cir. 2004).  See also *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 76-77

(3d Cir. 2003) ("courts have an independent obligation to satisfy themselves of jurisdiction if it is

in doubt.  . . . A necessary corollary is that the court can raise *sua sponte* subject-matter

jurisdiction concerns.")

  In this case, plaintiffs claim the jurisdiction of the federal courts pursuant to section 1332,

based on diversity of jurisdiction.  Section 1332 requires "complete diversity: In a case with

multiple plaintiffs and multiple defendants, the presence in the action of a single plaintiff from

the same State as a single defendant deprives the district court of original diversity jurisdiction

over the entire action."  *Allapattah Services*, 545 U.S. at 553.  It also requires that there be a

minimum amount in controversy, currently $75,000.  *Id.* at 552.  The Supreme Court  explained

Congress's intent in creating diversity jurisdiction in section 1332 as follows:

> To ensure that diversity jurisdiction does not flood the federal courts with
> minor disputes, § 1332(a) requires that the matter in controversy in a diversity
> case exceed a specified amount . . .  § 1332(a). . . .

13

> [T]he purpose of the diversity [of citizenship] requirement . . . is to provide a federal forum for important disputes where state courts might favor, or be perceived as favoring, home-state litigants. The presence of parties from the same State on both sides of a case dispels this concern, eliminating a principal reason for conferring § 1332 jurisdiction over any of the claims in the action.

*Allapattah Services*, 545 U.S. at 553-54.

Because the federal courts have limited jurisdiction, the burden of establishing federal court jurisdiction is always on the proponent of jurisdiction, i.e., plaintiff in a case originally filed in federal court and defendant in a state case removed to federal court. *Morgan v. Gay*, 471 F.3d 469, 474 (3d Cir. 2006); *Packard v. Provident Nat. Bank*, 994 F.2d 1039, 1044-45 (3d Cir. 1995) ("person asserting jurisdiction bears the burden of showing that the case is properly before the court at all stages of the litigation"); *Boyer v. Snap-On Tools Corp*., 913 F.2d 108, 111 (3d Cir. 1990) ("party who urges jurisdiction on a federal court bears the burden of proving that jurisdiction exists"), *cert. denied*, 498 U.S. 1085 (1991).   If there are any factual disputes as to the court's jurisdiction, the proponent has the burden of establishing the necessary facts by a preponderance of the evidence.  *Samuel-Bassett v. KIA Motors America, Inc.*, 357 F.3d 392, 397-98 (3d Cir. 2004).

### iii.    Diversity Jurisdiction.

As noted, in order to sustain diversity jurisdiction, all of the parties on one side of the controversy must be citizens of different states than all of the parties on the other side, *Midlantic Nat'l Bank v. Hansen*, 48 F.3d 693, 696 (3d Cir. 1995), and there must be *complete diversity* -- that is, no plaintiff may be a citizen of the same state as any of the defendants. *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806); *Allapattah Services*, 545 U.S. at 553-54.

14

The necessary allegations of each party's citizenship must affirmatively appear on the face of the complaint. *Krasnov v. Dinan,* 465 F.2d 1298, 1300 (3d Cir. 1972) ("residency in a state is insufficient for purposes of diversity"); *Guerrino v. Ohio Cas. Ins. Co.,* 423 F.2d 419, 421 (3d Cir. 1970) ("[a]llegations of citizenship are required to meet the jurisdictional requirement"); *Knop v. McMahan*, 872 F.2d 1132, 1137 n.11 (3d Cir. 1989) ("the citizenship of a partnership is determined by looking to the citizenship of its general and limited partners").

Moreover, the amount in controversy also must appear on the face of the complaint. *See Levy v. Weissman*, 671 F.2d 766, 767 (3d Cir. 1982). "The allegations on the face of the complaint control the amount in controversy unless it appears 'to a legal certainty the claim is really for less than the jurisdictional amount. . . .'" *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 353 (1961), *quoting St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938). Uncertainty arises where, as here, the complaint is for equitable or declaratory relief or is for an indeterminate amount.  Where the complaint does not hone its request for damages to a precise monetary amount, the Court must make an independent evaluation of the value of the claim from the record before it.  *Angus v. Shiley Inc.*, 989 F.2d 142, 146 (3d Cir. 1993).

### iv.     Amount in Controversy - Legal Certainty in Class Actions.

Even if no party raises the issue, the district court may take the initiative and probe the sufficiency with which the amount in controversy has been pled.  *Golden*, 382 F.3d at 354. The party wishing to establish subject matter diversity of citizenship jurisdiction has the burden to prove to a legal certainty, at all stages of the litigation, that the amount in controversy exceeds the statutory threshold.  *Morgan*, 471 F.3d at 474; *Samuel-Bassett*, 357 F.3d at 397.  The United

States Court of Appeals for the Third Circuit rendered invaluable, and much needed, guidance to the district courts on the issue of determining the amount in controversy where the amount set forth in the complaint is indeterminate in *Samuel-Bassett v. KIA Motors America, Inc.*  In *Samuel-Bassett*, an automobile buyer brought a putative class against the automobile manufacturer in state court, seeking damages arising from automobile's allegedly defective brake system, under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, and alleging breach of warranty.  The District Court granted class certification and defendant took an interlocutory appeal. Before reaching the class certification issue, however, the Court of Appeals was first "obliged to examine subject matter jurisdiction," of which it had doubts. *Id.* at 395.

Finding the record inadequate to resolve the issue, and finding that the law in the Circuit with regard to determination of a disputed amount in controversy [including its own] was "unencumbered by consistency," Judge Weis, writing for the panel, remanded to the District Court to make the determination of amount in controversy, with the following guidance:

> The Supreme Court has discussed the nature of a defendant's burden of proof in a removal case [based on diversity of citizenship]. In *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283 (1938) the plaintiff, in seeking a remand to the state court, amended the complaint after removal to allege damages less than the federal jurisdictional amount. The Court stated that the rule for determining whether the case involves the requisite amount as whether "from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed, or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount." *Id.* at 289.  If not, the suit must be dismissed.
>
> Some courts have found inconsistencies between *Red Cab* and *McNutt v. General Motors Acceptance Corp. of Indiana,* 298 U.S. 178,(1936). In the latter case, the Supreme Court held "that the party alleging jurisdiction [must] justify his allegations by a preponderance of the evidence." *McNutt,* 298 U.S. at 189. In that case, although a challenge to the amount in controversy had been raised in the pleadings, no evidence or findings in the trial court addressed that

issue. In that respect, *Red Cab* differs because these factual findings had been made.

Rather than reading articulations of the standard as variations, we believe that the holdings in these two cases may be reconciled. In many instances the amount in controversy will be determined in whole or in part by state law. For example, if state law denies recovery for punitive damages, the federal court would be required to disregard the value of such a claim asserted to be included within the jurisdictional amount. . . . In deciding applicable state law, the preponderance of the evidence standard would have no utility.

In many cases, however, disputes over factual matters may be involved. In resolving those issues, the *McNutt* preponderance of the evidence standard would be appropriate. FN3 Once findings of fact have been made, the court may determine whether *Red Cab's* "legal certainty" test for jurisdiction has been met.

FN3: A pretrial ruling on jurisdictional facts should not be made if it constitutes a decision on the merits. . . .

In short, despite the use by some courts of such phrases as "more likely than not," "substantial likelihood," and "reasonable probability," we recommend that when the relevant facts are not in dispute or findings have been made the District Courts adhere to the "legal certainty" test cited in [numerous listed] cases . . . .

*Samuel-Bassett*, 357 F.3d at 397-98 (parallel and other citations omitted; footnote omitted).

Important to this case, the Court of Appeals for the Third Circuit repeated its admonition from previous cases that "in order to carry out the Congressional intent in diversity cases, doubts must be resolved" against the proponent of jurisdiction, and, moreover, reminded district courts that their "estimations of the amounts recoverable must be realistic. The inquiry should be objective and not based on fanciful, 'pie-in-the-sky,' or simply wishful amounts, because otherwise the policy to limit diversity jurisdiction will be frustrated." *Id.* at 403.

In a similar vein, while punitive damages may be considered in determining the actual amount in controversy, such damages cannot be aggregated in a class action, but rather, must be

17

pro rated amongst class members, and when the proponent of diversity jurisdiction submits punitive damages as the bulk of the threshold amount in controversy, the claims must be closely scrutinized.  See *Packard v. Provident Nat. Bank*, 994 F.2d 1039, 1046 (3d Cir. 1993) (claims for punitive damages may be aggregated with claims for compensatory damages unless "patently frivolous and without foundation.");  *Meritcare Inc. v. St. Paul Mercury Ins. Co.*, 166 F.3d 214, 218, 223 (3d Cir. 1999) (class action plaintiffs may not aggregate claims of class members to reach jurisdictional threshold, including punitive damages claims), abrogated on other grounds; *Lauchheimer v. Gulf Oil*, 6 F.Supp.2d 339, 346-47 (D.N.J. 1998) (collecting cases) (class members may not aggregate their claims for punitive damages in order to reach the requisite amount in controversy).

In *Exxon Mobile Corp. v. Allapattah Serv., Inc.*, the United States Supreme Court resolved an issue that had divided the Courts of Appeals, and held that the supplemental jurisdiction statute, 28 U.S.C. § 1367, permits exercise of diversity jurisdiction over additional plaintiffs in a class action case who fail to satisfy the minimum amount in controversy requirement, as long as the other elements of diversity jurisdiction are present and *at least one* named plaintiff satisfies the threshold amount in controversy requirement, abrogating, among other cases, *Meritcare, Inc. v. St. Paul Mercury Ins. Co.*, 166 F.3d 214 (3d Cir. 1999). *Allapattah Serv.*,  545 U.S. 549-51.

**v.    Timing.**

"The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed. *See, e.g., Smith v. Sperling*, 354 U.S. 91, 93, n. 1 (1957).  Like most general principles, however, this one is susceptible to exceptions . . . ." *Newman-Green, Inc. v.*

*Alfonzo-Larrain*, 490 U.S. 826, 830 (1989) (parallel citations omitted).  Thus, events subsequent to filing the complaint that reduce the amount in controversy below the statutory minimum set forth in 28 U.S.C. § 1332 do not, ordinarily, require dismissal.  *State Farm Mutual Auto. Ins. Co. v. Powell*, 87 F .3d 93, 97 (3d Cir.1996).  However, the "distinction must be made between *subsequent events* that change the amount in controversy and *subsequent revelations* that, in fact, the required amount was or was not in controversy at the commencement of the action."  *Id*. (emphases added).

The "subsequent revelation" exception (i.e., subsequent revelations show there was never jurisdiction in the first place) stems from *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938), and allows courts to look beyond the allegations of the complaint when subsequent events reveal that the amount actually in controversy at the time of filing was less than the threshold amount. As the United States Supreme Court stated in *Red Cab*:

> The intent of Congress drastically to restrict federal jurisdiction in controversies between citizens of different states has always been rigorously enforced by the courts. The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith.  It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. . . . [I]f, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed or if, *from the proofs*, the court is satisfied to a like certainty that the plaintiff *never was entitled to recover that amount*, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed.  Events occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction.

303 U.S. at 289-90 (emphasis added).

19

In a recent case, *Carlisle v. Matson Lumber Co.*, 186 Fed.Appx. 219, 226 (3d Cir. 2006), the Court of Appeals for the Third Circuit emphasized that this subsequent revelation/ subsequent event analysis "is the kind of determination that courts are explicitly permitted, if not encouraged, to rely upon when questioning the jurisdictional basis for a suit." A respected treatise cautions that the failure to satisfy the jurisdictional amount from the outset, "although not recognized until later, is not a subsequent change that can be ignored." 15 James W. Moore et al., *Moore's Federal Practice* ¶ 102.104[3], at 102-167 (3d ed. 1998). In *Carlisle*, the Court of Appeals held that District Court did not err in dismissing the case for want of jurisdiction at the summary judgment stage, when it found that res judicata precluded some of plaintiff's claims that had initially been factored into the threshold jurisdictional amount, and that the remaining claim did not satisfy the amount in controversy requirement for diversity jurisdiction, relying on *Powell* decision.

In *Powell*, the Court of Appeals considered the impact of the District Court's realization at the summary judgment stage that, of three insurance policies claimed to be applicable in the Complaint, only two were actually valid. *Powell,* 87 F.3d at 97. The Court of Appeals deemed this "discovery" as a post-filing "revelation" regarding the status and validity of the claims in the Complaint at the time of filing, and thus distinguished the revelation from a "subsequent event" that merely altered the amount of a plaintiff's potential recovery. *Id.*

And in *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492 (3d Cir. 1996), the Court of Appeals acknowledged the general rule that federal jurisdiction is ordinarily determined from the facts as they exist when the complaint (or removal petition) is filed, but nevertheless held that the general rule did not preserve federal question jurisdiction

after voluntary dismissal of the Resolution Trust Corporation (created under the Financial

Institutions Reform, Recovery, and Enforcement Act, known as "FIRREA") eliminated the hook

for exercise of federal question jurisdiction. *Id.* at 1504 ("Our rejection of an absolute time of

filing requirement breaks no new ground. Courts that have considered the rule more fully have

not hesitated to abandon it where appropriate.").

> ### vi.    Application.

After careful consideration of Defendants' Motion to Dismiss for Lack of Subject Matter

Jurisdiction (doc. no. 310), plaintiffs' response thereto, the plaintiffs initial and amended

complaints (including their Third Amended Complaint submitted with their motion for leave to

amend), the record before the Court, and the decision of the United States Court of Appeals for

the Third Circuit, *Huber v. Taylor*, 469 F.3d 67 (3d Cir. 2006), this Court finds it a legal certainty

that plaintiffs' remaining claims do not meet the requisite $75,000 amount in controversy

threshold to sustain federal court jurisdiction.

This Court's Memorandum Opinion of February 7, 2005, held:

> This Court finds that plaintiffs have failed to present evidence from which a
> reasonable person could conclude that defendants alleged non-disclosures
> proximately caused any plaintiff to accept settlements they would not have
> otherwise accepted.  Rather, the evidence shows that plaintiffs either were
> given or had direct access to such information but chose to remain unaware,
> and at best did not recall basic facts surrounding when, where and if they read
> the documentation presented to them explaining the settlement.

## V. CONCLUSION

As highlighted above, plaintiffs assert numerous torts, both intentional
and unintentional, against defendant attorneys - all of which require plaintiffs
to establish the essential elements of duty, breach, cause and harm.  Even
assuming for sake of argument that plaintiffs can show that defendant attorneys
owed certain duties to them and breached the duties owed to them, plaintiffs

have failed to present evidence creating a material issue of fact regarding whether defendant attorneys' alleged misconduct proximately caused them harm, nor have they presented evidence regarding any actual harm suffered by them.  Therefore, defendant attorneys' motion for summary judgment will be granted and plaintiffs' motion for partial summary judgment will be denied.

Mem.Op. (doc. no. 279), at 36-37.

Defendants argue that this Court does not have subject matter jurisdiction over the dispute because the Court of Appeals "affirmed this Court's finding that plaintiffs suffered no actual damages, and limited plaintiffs' remedy to disgorgement of the attorney's fees paid to defendants in the underlying asbestos injury litigation.  Accordingly, no named plaintiff can satisfy the $75,000 amount-in-controversy requirement under 28 U.S.C. § 1332(a), and as a result this action must be dismissed on the basis of a lack of subject matter jurisdiction."  Memorandum of Law in Support of Motion to Dismiss (doc. no. 310) at 1.

Plaintiffs did not appeal the ruling with regard to any other of the numerous causes of action this Court rejected, only with regard to Texas law fiduciary duty.  All three panel members of the Court of Appeals for the Third Circuit agreed with this Court's finding that plaintiffs could not and had not shown that there were any actual damages that befell them as a result of any of plaintiffs' claims, including the breach of fiduciary duty claims (breach of fiduciary duty, conspiracy to breach fiduciary duty, aiding and abetting breach of fiduciary duty) under Texas law.  See *Huber*, 469 F.3d at 73 (Majority Opinion: "We agree with the District Court that, if Plaintiffs must show causation and actual injury, they lose on both parts of their appeal."), and 85 (Fuentes, J., dissenting: "As the majority itself concedes, if plaintiffs are required to show actual injury to succeed on their claims, they lose as to both elements of their appeal. . . .  Plaintiffs cannot demonstrate that, absent defendants' alleged conduct, they would have achieved a better

outcome."). The point of departure for the *Huber* majority was that, under its analysis that only

Texas' law regarding the fiduciary duty of candor and loyalty owed by attorneys to their clients

applied,[4] the relevant [Texas] law did not require a showing of causation and actual injury. *Id*.

### vii.    Law of the Case.

Under the doctrine of the law of the case, "when a court decides upon a rule of law, that

decision should continue to govern the same issues in subsequent stages in the same case."

*Arizona v. California*, 460 U.S. 605, 618 (1983). The doctrine is designed to protect finality,

judicial economy, and jurisprudential integrity. *Christianson v. Colt Industries Operating Corp.*,

486 U.S. 800, 815-16 (1988). "Courts apply the law of the case doctrine when their prior

decisions in an ongoing case either expressly resolved an issue or necessarily resolved it by

implication." *United Artists Theatre Circuit, Inc. v. Township of Warrington, PA*, 316 F.3d 392,

397-98 (3d Cir. 2003), quoting *Aramony v. United Way of America*, 254 F.3d 403, 410 (2d Cir.

2001).

---

[4] In deciding the question "Under What Laws Were the Fiduciary Duties Created?", *Huber*, 469 F.3d at 79-81, the Court of Appeals for the Third Circuit decided that Texas had the most significant relationship and interests regarding breach of fiduciary duty, primarily because defendant Taylor, who practices law in Texas, was the prime mover in the various "up" and "down" stream arrangements, was lead counsel in the litigations, and his "downstream" agreements with Local Counsel provided that, as to any disputes arising from those contracts, Texas law would govern. Local Counsel were not named as defendants, and because the Court of Appeals found that Taylor could not be subject to the disciplinary laws of Pennsylvania, Ohio or Indiana, the Court did not discuss the interests or laws governing attorney misconduct and discipline of these home states of the various plaintiffs, where Local Counsel practice law and where plaintiffs actually entered into an attorney-client relationship in the first instance. Thus, it is only Texas fiduciary duty law that is material to the decision on the pending motions, although the plaintiffs' home states no doubt have significant interests in the regulation of their attorneys, and also in protecting their residents from attorneys who do not adhere to their respective Codes of Professional Responsibility.

This Court considers the Court of Appeals' decision to be the law of the case regarding this Court's ruling that plaintiff has offered no evidence to support either causation or actual injury/ damages for any of their claims.  That decision is, therefore, the starting point for the analysis of all pending motions, and it informs the Court's determination on the amount in controversy, as subsequent revelations have shown, to a legal certainty, that there was never subject matter diversity jurisdiction.  At this point, only the fiduciary duty claims based on Texas law remain, and as the Court of Appeals stated, "fee forfeiture" remains at issue, and plaintiffs "are currently seeking 'disgorgement of Defendants' legal fees collected with respect to the *Cosey* and *Raken* actions, as well as compensatory and punitive damages.'" *Huber*, 469 F.3d at 77.

**viii.  Fee Forfeiture/ Disgorgement.**

"Fee forfeiture," or disgorgement, "would likely result in a larger recovery for Plaintiffs than compensatory damages.  Disgorgement could entail up to 39% of their total recovery (Taylor's 97.5% of the 40% contingent fee to Local Counsel), whereas compensatory damages could be *de minimis*.." *Id*. at 77, n.15.   Disgorgement is a restitutionary remedy, and it cannot extend beyond plaintiffs' recovery of the amounts of fees defendants derived directly from the current lawsuit's class members. See *Morgan*, 471 F.3d at 475 ("plaintiff has explicitly limited her claim to disgorgement as a restitutionary remedy, so that the type of disgorgement of profits sought by Morgan cannot extend any further than profits derived directly from sales . . . to . . . class members. *See also Tull v. United States,* 481 U.S. 412, 424 (1987) (stating that '[a]n action for disgorgement of improper profits is . . . a remedy only for restitution').  Based on these considerations, and without stepping into a larger discussion about potential differences between

disgorgement and restitution, we are satisfied that disgorgement in the context of this case only applies to profits earned by sales to class members.").

Accordingly, aside from punitive damages, which, this Court finds, are available to plaintiffs under Texas law,[5] plaintiffs could not seek disgorgement of an amount greater than the amount of legal fees defendants have received from them, i.e., "up to 39% of their total recovery (Taylor's 97.5% of the 40% contingent fee to Local Counsel). . . ."  Plaintiffs' Texas authority does not support their position that disgorgement could reach beyond the legal fees they paid out.

Defendants aver, and plaintiffs do not dispute, that no named plaintiff in this lawsuit paid more than approximately $13,000 in legal fees.  Thus, unless plaintiffs can establish to a legal certainty that punitive damages for that "highest fees" class member will exceed approximately $62,000, plaintiffs cannot demonstrate that this case meets the threshold amount in controversy.

Disgorgement is measured from a restitution standpoint, and not with reference to defendants' "profits" at large in the underlying litigation, as plaintiffs would have it, and the maximum amount of disgorgement/ restitution for any plaintiff is $13,000.  Plaintiffs have suffered no actual damages from defendants' alleged breach of fiduciary duties in this case, drastically reducing the chances of any large punitive damages recovery.  For plaintiffs to meet the minimum amount in controversy threshold, their recovery would consist of about 83 % in punitive damages.

---

[5] Defendants argue that punitive damages are not available for breach of fiduciary duties in Texas where there are no actual damages.  The Court agrees with plaintiffs that Texas law does permit recovery of punitive damages in such cases, even in the absence of actual harm or damages. See, e.g., *Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999).

### ix.     Failure to Meet Statutory Threshold Amount in Controversy.

As stated above, the Court of Appeals for the Third Circuit advised the district courts that determination of the amount in controversy actually in play must be "realistic . . . objective and not based on fanciful, 'pie-in-the-sky,' or simply wishful amounts, because otherwise the policy to limit diversity jurisdiction will be frustrated." *Samuel-Bassett*, 357 F.3d at 403.

Under all of the circumstances, this Court simply cannot say that, to a legal certainty, at least one plaintiff in the putative class satisfies the minimum statutory threshold of $75,000. Accordingly, this case must be dismissed for want of jurisdiction.

### B.     Defendants' Motion to Dismiss for Failure to Join Necessary and Indispensable Parties Under Rule 19 (doc. no. 310)

Defendants/ Lead Counsel assert that the Indiana, Ohio and Pennsylvania plaintiffs retained five attorneys from, respectively, Indiana, Ohio and Pennsylvania (non-party Local Counsel), and that Local Counsel are necessary and indispensable parties under Fed.R.Civ.P. 19 who must, in equity and good conscience, be joined in this lawsuit; because joinder of Local Counsel would defeat diversity jurisdiction, defendants argue that the case should be dismissed. This Court agrees.

### i.     Role of Local Counsel.

The fiduciary duty owed clients by their attorneys is a non-delegable fiduciary obligation that is jointly shared by and between *all* co-counsel.  "It is well-settled law, regardless of jurisdiction, that attorneys owe their clients a fiduciary duty . . .  If Local Counsel did not perform their fiduciary duty, it does not matter [to Lead Counsel's liability for breach of fiduciary duty]

that they assumed the duty *because the fiduciary duty of co-counsel is a joint obligation*.  Even if the duty of disclosure is itself delegable, the duty of loyalty is inherently not, and in this case *disclosure was necessary to fulfill the duty of loyalty*." *Huber*, 469 F.3d at 81-82 (emphasis added).

Mindful that dismissal of a lawsuit for failure to join a party whose joinder is not feasible, because it would defeat jurisdiction, is not favored, and is and should be a rare occurrence, plaintiffs' claims for breach of a fiduciary duty jointly owed *by all counsel* through the non-disclosure *by all counsel* in this case, and the inextricable entanglement between Local Counsel and Lead Counsel in the non-disclosure of critical information necessary to fulfill the duty of loyalty that precipitated plaintiffs' lawsuit, make this just such a rare case.  The undisputed facts pertinent to this motion are as follows:

Each of the named plaintiffs executed contingent fee agreements with and "retained counsel in their home states . . .  to prosecute their asbestos claims for a 40% retainer fee." *Huber*, 469 F.3d at 69-70.  Pennsylvania plaintiffs (Huber, Airgood, Defabbo, Dinio and Gishnook) retained Pennsylvania attorneys Stephen Colafella and William Mitchell; Indiana plaintiffs (Mullins and Deems) retained Indiana attorneys Rick Gikas and Linda Sams; the Ohio plaintiff (Bidlencsik) retained Ohio attorney James Tavens.

Lead Counsel (from Texas, Mississippi and North Carolina) apparently had no contact with plaintiffs; to the contrary, only Local Counsel and ParaPro actually interacted with plaintiffs regarding the asbestos litigation and settlement of their claims, including review and discussion of settlement documents.  According to Lead Counsel, Local Counsel Sams, Colafella, Tavens and Mitchell testified in their depositions as follows:  they had the direct, day-to-day contact with

27

their respective clients; the ParaPro paralegals worked out of Local Counsel offices in conducting asbestos litigation business and when meeting with plaintiffs about the settlements, with Local Counsel supervising the paralegals; Local Counsel interacted with and personally answered any questions any of the plaintiffs had about the settlement; and Local Counsel reviewed settlement documents which were sent from their offices to plaintiffs.  Plaintiffs do not offer any evidence to dispute these averments nor do they suggest that Lead Counsel had any contacts with plaintiffs.

In fact, the Court of Appeals for the Third Circuit found that "Plaintiffs did not have *any* direct relationship with Defendants."  *Huber,* 469 F.3d at 80 (emphasis added).  There is no indication on the record before the Court that plaintiffs even knew who Lead Counsel was, and, in fact, "Plaintiffs allege that they were never informed of the various co-counsel arrangements" between their retained Local Counsel and Texas counsel, Robert G. Taylor II, or any of the "upstream co-counsel" fee  arrangements made by Texas counsel with the Mississippi and North Carolina attorneys. *Huber,* 469 F.3d at 70.  Accordingly, plaintiffs were ignorant of the contractual relationships and co-counsel arrangements for fee splitting made with Texas counsel Taylor *prior to* plaintiffs executing contingent fee agreements with Local Counsel, whose co-counsel/ fee arrangement with Local Counsel is, in the words of the United States Court of Appeals for the Third Circuit, "key for understanding Plaintiffs' case."  *Id.*

The Court of Appeals further illuminated the role played by Local Counsel (as previously stated in the Background Facts Section), as follows:

> After each of the settlement agreements was negotiated, the Northerners [plaintiffs] received various disclosures. These disclosures were made by Local Counsel and by Parapro Enterprises, Inc., a paralegal service [who, it is

undisputed,  worked out of the offices of Local Counsel] associated with Taylor. The Northerners were presented with a release, a check, and a disbursement sheet. The release was explained orally to Northerners by Parapro paralegals. The disclosures did not reveal the settlements' material terms or the nature of Defendants' involvement in the cases. The written disclosures stated that further information about the settlements was available on request. The record does not state whether any of the Plaintiffs sought to avail themselves of this information.[FN 9]

> FN9 Plaintiffs have introduced evidence that neither the Parapro paralegals nor Local Counsel were themselves aware of the full terms of the settlements or even had access to the complete settlement agreements.

*Id.* at 71-72.

### ii.    Federal Rule of Civil Procedure 19 - Joinder of Persons Needed for Just Adjudication.

Fed.R.Civ.P. 19 provides in pertinent part:

**(a) Persons to be Joined if Feasible.** A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, <u>or</u> (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest <u>or</u> (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. . . .

**(b) Determination by Court Whenever Joinder not Feasible.** If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether

the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed.R.Civ.P. 19.

As is set forth explicitly in the rule, the Court does not reach the "indispensable party" analysis of Rule 19(b) unless and until the Court determines that a missing defendant is a "necessary party" under Rule 19(a) whose joinder is not feasible because it would destroy jurisdiction. *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 402 (3d Cir. 1993).

### iii.    Rule 19(a).

Rule 19(a) is stated in the disjunctive: a non-joined person should be deemed a necessary party if any one of three situations exist: (1) in the person's absence complete relief cannot be accorded among those already parties (Rule 19(a)(1)); (2) the missing person "claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect that interest." (Rule 19(a)(2)(i)); or, (3) the missing person "claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may . . . leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." Rule 19(a)(2)(ii).

If any of these three situations are found, the missing party will be deemed necessary to the litigation; if joinder of such a necessary party is not feasible, the Court should proceed to the indispensable party determination of subsection (b).

**Rule 19(a)(1).**   This clause "stresses the desirability of joining those persons in whose absence the court would be obliged to grant partial or "hollow" rather than complete relief to the parties before the court. The interests that are being furthered here are not only those of the parties, but also that of the public in avoiding repeated lawsuits on the same essential subject matter." *Bank of Am. Nat'l Trust & Savs. Assoc. v. Nilsi*, 844 F.2d 1050, 1055 n. 5 (3d Cir. 1988) (citing Fed.R.Civ.P. 19(a) Advisory Committee note to the amended rule).

As plaintiffs correctly point out, however, subdivision (a)(1) was primarily enacted to avoid litigation leading to partial or hollow relief between the existing parties, and it asks whether complete relief is possible between those parties, not between a party and a non-party. *Sindia Expedition, Inc. v. Wrecked and Abandoned Vessel, Known as The "Sindia,"* 895 F.2d 116, 121 (3d Cir. 1990), quoting 3A Moore's Federal Practice ¶ 19.07-1[1], at 93-98 (2d ed. 1989) ("'complete relief' refers to relief as between the persons already parties, and not as between a party and the absent person whose joinder is sought. Mere theoretical considerations of disposing of the whole controversy do not warrant compulsory joinder when it appears unlikely that the absent persons could be affected. Nor is joinder necessary where, although certain forms of relief are unavailable due to a party's absence, meaningful relief can still be provided."); *Angst v. Royal MacCabees Life Ins. Co.*, 77 F.3d 701, 705 (3d Cir. 1996) (under subsection (a)(1), "we first consider whether complete relief can be accorded among those who are already parties in the receiver's absence").

On one hand, broadly speaking, complete relief is not available because Local Counsel and Lead Counsel split the fees generated by plaintiffs' settlement, and if plaintiffs prove a breach of fiduciary duty for non-disclosure, they presumably could only compel disgorgement

31

from defendants of the portion of the fees they collected, and not Local Counsel's portions.  And there is a public interest in avoiding multiple litigation on the same essential subject.  However, plaintiffs may legitimately seek more narrow relief from the present parties, and Rule 19 does not routinely require the joinder of joint tortfeasors simply because they may also be obligated to the plaintiffs.  See *Temple v. Synthes Corp., Ltd.,* 498 U.S. 5, 7 (1990) ("It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit.") ; *Bank of America v. Hotel Rittenhouse Assoc.*, 844 F.2d 1050, 1054 (3d Cir. 1988),  citing *Field v. Volkswagenwerk A.G.*, 626 F.2d 293, 298 (3d Cir. 1980); see also *Shepard Niles, Inc.*, 11 F.3d at 406.

Although Local Counsel are no doubt joint tortfeasors in the alleged breach of fiduciary duty based upon non-disclosure of critical information about the fee arrangements, the Court agrees with plaintiffs that, from the "present parties" perspective, complete relief is available *between these current parties* under Rule 19(a)(1) since all they seek at this point (as set forth in the Third Amended Complaint plaintiff seek leave of court to file, which would conform their remaining claims to the decision of the Court of Appeals) is for Lead Counsel to cease and desist in breaching their fiduciary duties to plaintiffs and for Lead Counsel to disgorge their portion of the attorneys fees split with Local Counsel.  This does not, however, end the Rule 19(a) inquiry, only the subsection (a)(1) inquiry.

Although defendants only assert Rule 19(a)(1) grounds for finding Local Counsel to be necessary parties, and plaintiffs only respond to that argument, it is appropriate and, indeed, imperative that this Court examine the other facets of disjunctive Rule 19(a) to determine whether Local Counsel are necessary parties whose joinder would destroy diversity jurisdiction,

32

since, after all, it is the continuing obligation of the federal courts to ensure that jurisdiction exists at all times. See *Schulman v.  J.P. Morgan Inv. Mgmt., Inc.*, 35 F.3d 799, 804 (3d Cir. 1994) (federal courts may "raise *sua sponte* problem of joinder without motion of parties").  See also *Golden*, 382 F.3d at 354 (federal courts are under "a continuing obligation to investigate their jurisdiction over the matters before them."); *Nesbit,* 347 F.3d at 76-77 ("courts have an independent obligation to satisfy themselves of jurisdiction if it is in doubt.  . . . A necessary corollary is that the court can raise *sua sponte* subject-matter jurisdiction concerns.").

Accordingly, the Court must also consider Rule 19(a)(2), which is the proviso that views the case from the perspective of the absent party, and which requires the court to consider the effect the pending litigation would have on the absent parties' interests, i.e., Local Counsel.  As with the decision of the Court of Appeals for the Third Circuit regarding the choice of Texas law, the parties herein have adequately raised the issue of failure to join a necessary and indispensable party to alert the Court to all of the potential Rule 19 problems, and it would be remiss of this Court to find that defendants have waived an argument based on Rule 19(a)(2)(i) reliance because they specifically addressed only subsection 19(a)(1).

**Rule 19(a)(2)(i)**.  Local Counsel will be deemed necessary parties under subsection (a)(2)(i) if they are persons who would claim "an interest relating to the subject of the action and [are] so situated that the disposition of the action in [their] absence may . . . as a practical matter impair or impede [their] ability to protect that interest."  This subsection "requires a court to decide whether determination of the rights of the parties before it would impair or impede an absent party's ability to protect its interest in the subject matter of the litigation. . . ."  *Shepard Niles, Inc.*, 11 F.3d at 406.  As the Court of Appeals stated therein:

33

> [J]oinder of an absent party is compulsory under Rule 19(a)(2)(i) if the federal litigation would have a preclusive effect against the absent party in subsequent state litigation. *Acton Co. v. Bachman Foods, Inc.,* 668 F.2d 76, 78 (1st Cir. 1982). Indeed, we agree [with *Acton*.]. If issue preclusion or collateral estoppel could be invoked against [the non-party] in other litigation, continuation of the federal action could "as a practical matter impair or impede" [that party's] interests and so Rule 19(a)(2)(i) would require its joinder if joinder were feasible. Fed.R.Civ.P. 19(a)(2)(I).

*Shepard Niles*, 11 F.3d at 409.

Thus, a party must be joined under Rule 19(a)(2)(i) if "some outcome of the federal case that is reasonably likely can preclude the absent party with respect to an issue material to the absent party's rights or duties under standard principles governing the effect of prior judgments." *Id.* Rule 19(a)(2)(i) implicates principles of collateral estoppel or issue preclusion. Under Pennsylvania law on issue preclusion, a party may be precluded from relitigating an issue only if:

> "(1) the issue decided in the prior adjudication was identical with the one presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party *or in privity with a party* to the prior adjudication; and (4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action."

*Shepard Niles,* 11 F.3d at 409 n. 12 (emphasis added), quoting *Sanders v. Sanders,* 384 Pa.Super. 311, 558 A.2d 556, 560 (1989) (citation omitted), *alloc. denied,* 525 Pa. 635, 578 A.2d 930 (1990). Each of the other jurisdictions with which we might be concerned have similar rules of issue preclusion, each jurisdiction providing that its rule of issue preclusion applies to a party in privity with the litigating party. *O'Nesti v. DeBartolo Realty Corp.*, 862 N.E. 2d 803, 806-807 (Ohio 2007); *Sims v. Scopelitis*, 797 N.E. 2d 348, 351 (Ind. App. 2003); *Texas Commerce Bank National Association v. Wood*, 994 S.W.2d 796, 809 (Tex. Ct. App. 1999).

34

**Application of Rule 19(a)(2)(i).**

There is no doubt that Local Counsel are necessary parties under subsection (a)(2)(i). Local Counsel have concrete, tangible interests, and intangible but profoundly significant professional interests, relating to the subject matter of the pending action, and trial in their absence would, as a practical matter, impair and impede their ability to protect their financial and professional interests.  This is because they are in privity with Lead Counsel in the performance of their jointly owed fiduciary duties to their mutual clients, so that judgment entered against Lead Counsel could preclude Local Counsel from defending against any future claims for liability for breach of fiduciary duty, and from disputing any determination regarding their joint failure to disclose critical information to their clients in any disciplinary proceedings plaintiffs might initiate with the Disciplinary Boards of Pennsylvania, Indiana or Ohio.

**Issue Preclusion and Privity.**

Mutuality of parties is not required for issue preclusion to apply under Pennsylvania law; the only requirement is that the party against whom collateral estoppel is asserted be a party to the prior adjudication. *Wikowski v. Welch*, 173 F.3d 192 (3d Cir. 1999).  In the case of either claim preclusion or issue preclusion, the requirement of either identity of parties or party against whom the issue is asserted is met if either of the doctrines are asserted against a party to the present litigation who, although a nonparty in the prior litigation, may be found to have been in privity with the party to the prior litigation, such as in cases where the party in the present case was represented in the prior litigation by a party who acted in a representative capacity to the party in the present litigation. *First Options of Chicago Inc. v. Kaplan*, 913 F. Supp. 377 (E.D.

Pa. 1996), citing *Moldovan v. Great Atlantic & Pacific Tea Co. Inc.*, 790 F.2d 894 (3d Cir.

1986), *cert. denied*, 108 S.Ct. 1074 (1988).

An in-depth and comprehensive discussion of the issue of privity is discussed in the *First

Options* case, interpreting federal principles of claim preclusion:

> Res judicata or claim preclusion works to prevent a party from raising or
> defending against a claim that has already been decided. Claim preclusion
> requires a showing that there has been "(1) a final judgment on the merits of a
> prior suit involving (2) the same claim and (3) the same parties or their
> privies." *Equal Employment Opportunity Comm. v. United States Steel Corp.,*
> 921 F.2d 489, 493 (3d Cir.1990) (citing *United States v. Athlone Indus., Inc.,*
> 746 F.2d 977, 983 (3d Cir.1984)).  . . .

> \*   \*   \*

> The term privy "is merely a word used to say that the relationship
> between one who is a party on the record and another is close enough to
> include the other within the res judicata." *United States Steel Corp.,* 921 F.2d
> at 493 (citing *Bruszewski v. United States,* 181 F.2d 419, 423 (3d Cir.), *cert.
> denied,* 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950)); *Phillips v. Kidder,
> Peabody & Co.,* 750 F.Supp. 603, 607 (1990) ("[Privity is a legal
> determination for the trial court as to whether the relationship between the
> parties is sufficiently close to support preclusion."). Courts have typically
> found privity to exist in three circumstances: (1) where the nonparty has
> succeeded to, or shares a concurrent right to the party's interest in, property, (2)
> where the nonparty controlled the prior litigation, and (3) where the party
> adequately represented the nonparties' interests in the prior proceeding. *See,
> e.g., Latham v. Wells Fargo Bank, N.A.,* 896 F.2d 979, 983 (5th Cir.1990); 1B
> *Moore's Federal Practice* ¶ 0.411[1], at III-215.

> \*   \*   \*

> The Third Circuit [Court of Appeals] has long recognized that privity is
> a legal conclusion; the privity inquiry should be flexible enough to
> acknowledge the realities of parties' relationships. *Bruszewski,* 181 F.2d at 423
> (noting that the test for privity is whether there is a sufficiently close
> relationship between the party to the prior litigation and the nonparty against
> whom the prior judgment is being used). More recently, in *Moldovan v. Great
> Atlantic & Pacific Tea Co.,* 790 F.2d 894 (3d Cir. 1986), *cert. denied,* 485 U.S
> 904, 108 S.Ct. 1074, 99 L.Ed.2d 233 (1988), a panel was asked to determine

whether an arbitration ruling to which a union was a party should have preclusive effect in an action to which pension fund trustees were a party. The opinion noted that the "party against whom the collateral estoppel has been asserted [must] have some fair relationship with the prior litigation relied upon." *Moldovan,* 790 F.2d at 899. The *Moldovan* opinion indicates that courts should focus on the "relationship" between the parties and determine "whether there is such an *identity of interests* between the first and second party that the second should ever be deemed in privity with the first." *Id.* (emphasis added). In the context of the labor union and trustees for the pension fund, the court determined that whether privity existed depended on the nature of the union's obligation to represent the interests of the trustees. *Id. . . .*

*First Options*, 913 F. Supp. at 383-84 (emphasis added; footnotes omitted).

Whether the "privity" determination for purposes of a Rule 19 analysis is strictly a matter of federal law or must borrow from the laws of the interested states (i.e., Texas, Pennsylvania, Indiana, Ohio) seems to be an open question in this Circuit, as the United States District Court explained in *First Options*, 913 F. Supp. at 383, n. 18.[6]  However, as that Court held, this Court

---

[6]     The District Court stated in *First Options*, 913 F.Supp. at 383, n.18:

The Court of Appeals for the Third Circuit has not determined the appropriate law of preclusion - state or federal - that a federal court exercising its diversity jurisdiction should apply when considering the preclusive effect of a judgment rendered by another federal court which exercised diversity jurisdiction or decided a question of state law. *Lubrizol Corp. v. Exxon Corp.,* 929 F.2d 960, 962 & n. 2 (3d Cir.1991) (noting that the Third Circuit has not yet ruled on the issue); *but see Collins v. E.I. Dupont De Nemours & Co.,* 34 F.3d 172 (3d Cir.1994) (applying state preclusion law, without discussion, in a diversity case to determine the effect of a prior federal court decision).

In *Lubrizol,* however, the Third Circuit recognized, without approval or disapproval, that the majority of the courts of appeals have concluded that federal law on preclusion should apply in such circumstances. *Lubrizol,* 929 F.2d at 962 n. 2; . . .

In addition, the *Lubrizol* opinion further noted that some courts look to state law to resolve substantive issues that may arise when applying federal res judicata or collateral estoppel principles; privity is frequently mentioned as one such

need not resolve the state-federal law issue now because the rule that parties in privity to parties

in the former litigation are precluded from relitigating issues finally decided in the former

litigation is fairly universal and is not inconsistent with the federal law of this circuit.  *First*

*Options*, 913 F. Supp. at 384. See *O'Nesti v. DeBartolo Realty Corp*., et al., 862 N.E. 2d 803,

806-807 (Ohio 2007); *Sims v. Scopelitis*, 797 N.E. 2d 348, 351 (Ind. App. 2003); *Texas*

*Commerce Bank National Association v. Wood*, 994 S.W.2d 796, 809 (Tex. Ct. App. 1999).

**Fiduciary Duties of Local Counsel.**

Given the unique nature of the fiduciary duty of attorneys who act as co-counsel for

mutual clients, this Court has no doubt that Local Counsel are in privity with Lead Counsel under

the privity and preclusion rules of *any jurisdiction*.  As the Court of Appeals for the Third Circuit

explained so forcefully: "the fiduciary duty of co-counsel is a joint obligation."  *Huber*, 467 F.3d

at 82.  Indeed, this principle is *so fundamental and basic* to the legal profession that, even though

"neither Texas' Disciplinary Rules of Professional Conduct nor the Model Rules of Professional

Conduct directly address the question of allocation of professional duties in a co-counsel

relationship, . .  in the case of duty of loyalty, its non-delegability is *so patent as to be*

*axiomatic*."  *Huber*,  467 F.3d at 82, n. 18 (emphasis added).   These axiomatic ethical

obligations embrace "giving clients full and meaningful disclosure of conflicts of interest so that

the client may decide if the representation is in his or her best interest and of the terms of

---

substantive issue to which state law should apply. *Lubrizol*, 929 F.2d at 962 n. 2.
Again, the court did not indicate its agreement or disagreement with such
decisions.

proposed settlement agreements, as it is the client's, not the attorney's, decision whether to settle a case." *Huber*, 467 F.3d at 82.

The Pennsylvania, Indiana and Ohio attorneys, who, after all, were the *only* attorneys with whom plaintiffs communicated, entered into contingent fee agreements, had a direct attorney-client relationship, and had direct dealings regarding the litigation and settlement, are, patently and axiomatically, bound by the very same ethical obligations to plaintiffs; if anything, their obligations are even stronger since the plaintiffs retained Local Counsel, not Texas, Mississippi or North Carolina counsel who were swimming up and down the stream.

The Court holds that Local Counsel are necessary parties to this litigation under Fed.R.Civ.P. 19(a)(2)(i), and will proceed therefore to subsection (b) of the Rule. (There is no need to consider Rule 19(a)(2)(ii). *Guthrie Clinic, Ltd. v. Travelers Indem. Co. of Ill.*, 104 Fed.Appx. 218, 222 (3d Cir. 2004), quoting *Angst v. Royal Maccabees Life Insur, Co.,* 77 F.3d 701, 706 (3d Cir.1996) ("Under Rule 19(a), we need only find that the party's absence results in any of the problems identified in the rule.").)

iv.     **Rule 19(b).**

If a person is deemed a necessary party under Rule 19(a), the Court must then determine "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." Fed.R.Civ.P. 19(b)(2).  This determination is made by considering the four non-exclusive factors built into subsection (b), which is not to be a rote or arithmetic exercise but, rather, is intended to be a pragmatic, case-by-case consideration of the factors and the practical effects of a decision to

proceed without the necessary party or to dismiss.  See e.g., *Provident Tradesmen's Bank & Trust*, 390 U.S. 102, 118-19 (1968) ("Whether a person is 'indispensable,' that is, whether a particular lawsuit must be dismissed in the absence of that person, can only be determined in the context of particular litigation. . . . The decision whether to dismiss (i.e., the decision whether the person missing is 'indispensable') must be based on factors varying with the different cases, some such factors being substantive, some procedural, some compelling by themselves, and some subject to balancing against opposing interests."); *Dixson v. Murphy*, 202 Fed.Appx. 578, 581 (the Rule 19(b) list of four factors "is not an exhastive list of factors that can be considered, but they are the most important factors."), citing *Gardiner v. V.I. Water & Power Auth.*, 145 F.3d 635, 640-41 (3d cir. 1998); *Angst v. Royal MacCabees Life Ins. Co.*, 77 F.3d 701, 706 (3d Cir. 1996) ("The Rule lists four factors to be considered but does not accord a particular weight to any of them. 'This must be determined . . . in terms of the facts of a given case and in light of the equity- and- good- conscience test.'" citation omitted).

With those general principles in mind, the Court will consider the listed factors.

**1. The extent to which a judgment rendered in the persons' absence might be prejudicial to the persons or those already parties.**

**2. The extent to which the court may craft judgment or shape relief so that prejudice can be lessened or avoided.**

The Court considers the first two factors together.  Non-joinder of Local Counsel would be prejudicial to plaintiffs, since they would lose potential joint torfeasors from whom they could, if they prevail, obtain additional disgorged attorneys fees.  However, plaintiffs have chosen to forego that additional relief in this case, and the Court could craft the judgment and shape any equitable relief so that any prejudice to current defendants from non-joinder of Local

Counsel might be lessened or avoided. Indeed, a defendant's possible right of reimbursement, indemnity or contribution against an absent party is not sufficient to make the absent party indispensable to the litigation. See *Field*, 626 F.2d at 298.

These first two factors, then, do not require a finding that Local Counsel are indispensable.

### 3. Whether a judgment rendered in the person's absence will be adequate.

What drives the Court's finding that Local Counsel are indispensable parties to this litigation -- and that in equity and good conscience, the case should not proceed without them -- is that a judgment rendered in their absence will not be adequate to protect their financial and professional interests, both of which are quite significant. Financially, there are, in the aggregate, millions of dollars of fees at stake which Local Counsel could potentially be liable to disgorge, should the disclosure issue go against Lead Counsel and should Local Counsel be precluded from relitigating that issue. *Huber*, 467 F.3d at 70-71 (up to ten million dollars). Professionally, the Court finds the stakes are even higher - the stakes are the professional reputations and careers of Local Counsel.

This case has been drastically narrowed since its inception. As it stands now, the case is all about all about defendants' fiduciary duties and alleged breaches of their professional, fiduciary obligations of absolute loyalty to their clients, avoidance of conflicts and disclosure of all critical and important information necessary to make an informed and meaningful decision whether to accept a settlement. As the Court of Appeals for the Third Circuit stated, again quite forcefully, this is a "matter so elementary to the legal profession that it speaks for itself: all attorneys in a co-counsel relationship individually owe each and every client the duty of loyalty.

41

For it to be otherwise is inconceivable. There is no question that defendant attorneys owed

Plaintiffs fiduciary duties." *Huber*, 469 F.3d at 82.

Similarly, there is no question that Local Counsel owed their clients exactly the same the

duty of loyalty and had the fiduciary obligation to make full disclosure of any and all potential

conflicts and the co-counsel arrangements they previously had entered into with Texas counsel -

for it to be otherwise would be inconceivable.  It was, after all, Local Counsel  with whom

plaintiffs entered into contingent fee agreements which created any of the fiduciary relationships

in the first place where; it was Local Counsel who had previously entered into the co-counsel fee

splitting  arrangement with Texas counsel which is the "key to understanding plaintiffs' case,"

*Huber*, 469 F.3d at 70, without bothering to inform plaintiffs of the arrangements (plaintiffs

allege that *no one* ever told them about the arrangements); and it was Local Counsel who had all

lawyer-client communications with plaintiffs and supervised the paralegals working out of their

local offices who also communicated with plaintiffs.

As set forth above, Local Counsel are surely in privity with defendants / Lead Counsel,

and therefore they run the very real risk that any judgment entered against  defendants will

collaterally estop them from defending against claims that they breach their fiduciary duties to

their clients.  At issue in this litigation is whether Lead Counsel defendants violated their

fiduciary obligations to plaintiffs by failing to make requisite disclosures about the terms of the

settlements and the co-counsel fee splitting arrangements with Local Counsel.  If that issue is

resolved in plaintiffs' favor and against Lead Counsel, who are in privity with Local Counsel,

then it also will be resolved, practically speaking, against Local Counsel under the rules of issue

preclusion.  If plaintiffs did not receive the necessary disclosures from defendants, as they allege, they *necessarily* did not receive them from Local Counsel; otherwise, we would not be here.

The prejudice to Local Counsel from issue preclusion is not just the potential financial prejudice of having to disgorge millions in legal fees.  Disgorgement may not even be the <u>most</u> serious or lasting prejudice that would come from a finding that neither Lead nor Local Counsel disclosed critical information regarding and relevant to settlement to their mutual clients.  Most damaging to Local Counsel would be the diminishment of their professional reputations and the potential for disciplinary proceedings against them in their respective states, with the effect such proceedings might have on their legal practices.  The Supreme Court of Pennsylvania's Rules of Professional Conduct, for instance, specifically provides at Rule 1.5, "Fees":

> (e)      A lawyer shall not divide a fee for legal services with another lawyer who is not in the same firm unless:
>
> (1) the client is advised of and does not object to the participation of all the lawyers involved, and
>
> (2) the total fee of all the lawyers is not illegal or clearly excessive for all legal services they rendered the client.

Indiana and Ohio also have Canons and disciplinary rules regulating fee splitting with other lawyers and conflicts of interests (see Ohio Code of Professional Responsibility, DR2-107, "Division of fees among lawyers," and DR 5-101, "Refusing employment when the interests of the lawyer may impair the lawyer's independent professional judgment"; Indiana Code of Professional Responsibility, Canons 1.5 and 1.7) and even in the absence of any specific provision, the duty of loyalty to the client is non-delegable and so patent as to be "axiomatic."

In light of the serious financial and professional consequences to Local Counsel of an adverse determination on the crucial issue of non-disclosure by Lead Counsel in this litigation, Local Counsel must not be deprived of the opportunity to defend themselves from charges of breach of fiduciary duty and their respective state's Rules of Professional Conduct at a meaningful time, that is, before they are precluded from defending such charges by an adverse resolution of the issue in this case and application of the rules of issue preclusion.

**4. Whether the plaintiffs will have an adequate remedy if the action is dismissed for nonjoinder**.

Plaintiffs have adequate, but less convenient, remedies in other jurisdictions.  Texas is a likely candidate for all plaintiffs, because the contractual dealings with Texas counsel, who is at the hub of the events herein, surely affords specific personal jurisdiction (at least, if not general jurisdiction) in that state over all counsel to this litigation.  In their response, plaintiffs do not contend that they would have no available forum if this case were to be dismissed for failing to join an indispensable party (nor, for that matter, did defendants brief this issue), or that Texas' (or any other state's) statute of limitations would prevent them from bringing suit in that state. While it is open to some debate, this Court believes that Texas courts would hold that their statute of limitations for breach of fiduciary duty of a lawyer to his or her client (which may only have been two years if the cause of action accrued before August 30, 1999, and four years thereafter, see Tex. Civ. Prac. & Rem.Code Ann. § 16.004(a)(5);  *Rice v. Louis A. Williams & Assoc., Inc.*, 86 S.W.3d 329, 335-36 (Tex.App.- Texarkana 2002)) was tolled during the pendency of the federal court class action.  See *Prieto v. John Hancock Mut. Life Ins. Co*., 132 F.Supp.2d 506 (N.D.Tex. 2001) (discussing *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538,

44

552-53 (1974) (filing a federal class action law suits tolls statutes of limitations for potential

class members pending certification of the class, with regard to federal claims), and explaining

that  "Texas recognizes a similar tolling principle for state statutes of limitation based on a *state*

class action lawsuit involving *property damage* claims. . . . [but State] statutes of limitation are

*not* tolled, however, based on a *federal* class action lawsuit involving *personal injury* claims."

citations omitted).

Moreover, although not every state tolls its statute of limitations claims during the

pendency of federal class action litigation as a federal court will do when a federal class action is

dismissed or decertified, *American Pipe*, Pennsylvania, Indiana and Ohio do.  See 42 Pa.C.S. §

5103(b), "Transfer of erroneously filed matters - Federal cases"[7]; *Ferrari v. Antonacci*, 689 A.2d

---

[7] Section 5103, 42 Pa.C.S. § 5103, provides, in relevant part:

(a) General Rule. --

If an appeal or other matter is taken to or brought in a court . . . of this Commonwealth which does not have jurisdiction . . . , the court . . . shall not quash such appeal or dismiss the matter, but shall transfer the record thereof to the proper tribunal of this Commonwealth, where the appeal or other matter shall be treated as if originally filed in the transferee tribunal on the date when the appeal or other matter was first filed in a court . . . of this Commonwealth. A matter which is within the exclusive jurisdiction of a court . . . of this Commonwealth but which is commenced in any other tribunal of this Commonwealth shall be transferred . . . to the proper court . . . of this Commonwealth where it shall be treated as if originally filed in the transferee court . . . on the date when first filed in the other tribunal.

(b) Federal cases. --

(1) Subsection (a) shall also apply to any matter transferred or remanded by any United States court for a district embracing any part of this Commonwealth. . . .

(2) Except as otherwise prescribed by general rules, or by order of the United States court, such transfer may be effected by filing a certified transcript of the final judgment of the United States court and the related pleadings in a court or magisterial district of this Commonwealth.

320 (Pa. Super. 1997) ("Section 5103 . . . specifically governs the situation found here, where a matter is filed in a district court and is dismissed for lack of jurisdiction. In such instances, Section 5103 allows a matter to be transferred according to its provisions and permits the matter to be treated as filed on the date originally filed with the district court. "); *In re: Linerboard Antitrust Litig.*, 223 F.R.D. 335, 347, 349 (E.D. Pa. 2004) (listing Ohio and Indiana as states which follow *American Pipe* even as to state law claims), citing *Vaccariello v. Smith & Nephew Richards, Inc.,* 94 Ohio St.3d 380, 763 N.E.2d 160 (2002) (Supreme Court of Ohio adopted cross-jurisdictional class action tolling) and  *Arnold v. Dirrim,* 398 N.E.2d 426, 439 (Ind.App.1979) (Indiana Court of Appeals adopted cross-jurisdictional class action tolling).

Although plaintiffs would have to try their case in Texas, or split their case into three actions in respective states (each of which will undoubtedly have specific personal jurisdiction over Lead Counsel, who accepted representation of clients in those states and had continual communication with Local Counsel and ParaPro employees stationed in plaintiffs' home states), the attorneys who practice in those states will have an opportunity to defend themselves against potentially crippling liability and damage to their reputations and standing in the bar.

> **v.     Local Counsel Are Indispensable Parties.**

Local Counsel are not "garden variety" joint tortfeasors, by any means.  See *General Refractories Co. v. First State Ins. Co.*, 234 F.R.D. 99 (E.D.Pa. 2005) (while joint tortfeasors are not by that status alone indispensable parties, "given the fact combinations and permutations presented by the insurers' various policy provisions as to coverage, this is not a garden variety joint and several tortfeasor exercise. These complications militate in favor of having all the parties before the same court in one proceeding.").  On the contrary, Local Counsel are in privity

with defendants/ Lead Counsel, and they equally share the co-counsel responsibilities and fiduciary duties of absolute loyalty and full disclosure of any conflicts and meaningful information to their clients. Local Counsel are the co-instigators of the co-counsel fee arrangement with Taylor which is the "key to understanding this case," and they are the primary contact with the plaintiffs in terms of entering the contingent fee agreements with plaintiffs in the first instance, without telling them of the prior arrangement with Taylor, and primary attorney communicators of information and documents related to settlement.

In equity and in good conscience, Local Counsel are indispensable to this case, and because "the presence in an action of a single plaintiff from the same State as a single defendant deprives the district court of original diversity jurisdiction over the entire action," *Allapattah Serv., Inc.*, 545 U.S. at 553, this case must be dismissed without prejudice to plaintiffs filing suit in other jurisdictions.


C.     **Plaintiffs' Motion for Leave to File Third Amended Complaint (doc. no. 325)**

Following the decision of the Court of Appeals, the only viable causes of action are breach of fiduciary duties of candor and loyalty, conspiracy and aiding and abetting breach of fiduciary duty under Texas law.  Plaintiffs seek leave of Court essentially to amend their complaint to conform to the Court of Appeals' decision.  Motion for Leave to File Third Amended Complaint (doc. no. 325), Attachment 1, Proposed Third Amended Complaint.  The Third Amended Complaint does not alter the nature of the damages sought, *i.e.*, the fee forfeiture/ disgorgement remedy, nor could it, given the law of the case.  Nor can the Third

Amended Complaint change the states wherein Local Counsel and Lead Counsel practice law or wherein plaintiffs are citizens - citizenship of the parties and absent parties is what it is.

Although leave to amend pleadings should be liberally granted, sometimes even up to the time of trial if the opposing party will not be greatly prejudiced, leave is properly denied where, as here, amendment would be futile.  See *Foman v. Davis*, 371 U.S. 178, 182 (1962) (although leave to amend complaint should be freely granted and delay alone is not sufficient reason to deny leave, denial of leave to amend is appropriate where there has been "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, [and] futility of amendment."). Because amendment would not cure the jurisdictional defects discussed above, the Court must deny the motion to amend.

## V.    **CONCLUSION**

For all of the reasons set forth above, this Court will grant defendants' motion to dismiss for want of diversity jurisdiction, will grant defendants' motion to dismiss for failure to join an indispensable party, and will deny plaintiffs' motion to amend their complaint.  Given this Court's rulings on the motions to dismiss, the Court will deny any other pending motions as moot.  An appropriate order follows.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc: All counsel of record